UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**Emily J. Evans,**

    *Plaintiff*,

v.                    Case No. 3:14–cv–299
                       Judge Thomas M. Rose

**Phil Plummer,** *et al.*,

    *Defendants*.

---

**ENTRY AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. DOC. 60. SUMMARY JUDGMENT IS AWARDED TO DEFENDANTS RACHAEL YETTER, BRANDON YORT AND SHERIFF PHIL PLUMMER. THE MOTION IS DENIED WITH REGARD TO DEFENDANTS ERIC WAYNE BANKS AND THOMAS FEEHAN.**

---

Pending before the Court is Defendants Sheriff Phil Plummer, Eric Wayne Banks, Thomas Feehan, Rachel Yetter and Brandon Ort's, Motion for Summary Judgment. Doc. 60.[1] Movants request that the Court award them summary judgment on all counts of Plaintiff Emily Evans's Complaint. Doc. 1.  The complaint first alleges two corrections officers, Rachael Yetter and Brandon Ort, and two sergeants, Eric Banks and Thomas Feehan violated Plaintiff's civil rights as protected under 42 U.S.C. § 1983 by use of excessive force, and also alleges the same actions create a state law claims of assault and battery.[2]  Evans also sues Sheriff Plummer alleging failure

---

[1] Defense counsel is instructed to read Dayton General Order 12–01, Pretrial and Trial Procedures, Discovery and Motions Practice, Discovery and Motions Practice § 2.3 Motions Practice–Style.
[2] Plaintiff dismissed a state law claim of defamation. Doc. 67.

1

to train or supervise the other four Defendants under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**I.     Background**

This case arises out of an incident that occurred at the Montgomery County Jail in the early morning hours of March 30, 2014, after Plaintiff Emily Evans had been arrested for various charges, including driving under the influence and possession of marijuana.

Ohio State Highway Patrolman Carl Paulin arrested Evans early on March 30, 2014 under suspicion of driving under the influence. (Doc. 55, Deposition of C. Pauling, at PageID 1275 (page 53)). While Evans was being transferred to the Montgomery County Jail, she was verbally confrontational with Paulin, but Paulin "personally did not have any issues controlling [Evans]" and "never had to use force to control her by any means." (Id. at PageID 1264, 1265, 1268 (10:9, 13:9–15:25, 25:22–23)). Paulin acknowledged that verbal confrontation is not uncommon for someone in Evans' state. (Id. at (15:8–12)). Given Evans's intoxication, Paulin felt it best for Evans to "sit downtown and sober up and be in a controlled environment based on her demeanor." (Id. at PageID 1274 (49:4–7)).

Paulin graciously describes Evans's behavior. On the way to the jail, Evans urinated in the back of the patrol car, slammed her head against the partition, waved around the wet socks she urinated on inside the Centerville Police Department and propositioned Paulin. (Paulin Dep., 9:20–25; 50:22–25)). Paulin acknowledges that even this type of conduct is not out of the ordinary during an arrest of an intoxicated individual. (Paulin Dep., PageID 1265, (15:14–25)).

Due to Evans's intoxication, Paulin informed the jail that Evans was uncooperative when pulling into the sally port to transfer custody over to Defendants. (Id. at PAGEID l267, 1273– 1274

(21:6–25; 48–49)). That said, and despite Banks' later assertion to the contrary, Paulin adamantly testified that he never told Defendants that Evans was physical or combative:

> Q: And Sergeant Banks writes in his report Trooper Paulin advised us that Evans was highly intoxicated and had assaulted officers ... Is that accurate?
>
> A: The highly intoxicated. If they misconstrued assaulted by the urine, the assault is not correct. She never physically touched me or harmed anyone else in my presence ... [.]
>
> Q: And you never said, Sarge, she's assaulted officers?
>
> A: I do not recall saying anything like that.
>
> A: ... I didn't say that she physically assaulted.  I know for a fact I did not say that.

(Paulin Dep., PageID 1267, 13:5–19; 36:11–13).

Arrestees arriving at the Montgomery County Jail are classified immediately as either "cooperative" or "uncooperative."  When Paulin announced that Evans was uncooperative in the sally port that triggered a response from Defendants: if someone is reported as uncooperative, the jail typically assists the arresting officer with an increased number of corrections officers and will include one or two female officers if the individual is a female to assist in getting the individual out of the vehicle and into the inner processing area. (Deposition of Brandon Ort, PageID 787, (15:11–17)). The added assistance proved unnecessary, however, as Evans was cooperative and got out of the vehicle and into Defendants' custody without being uncooperative or physically combative. (Paulin Dep., PageID l267, (24:3–18)).

Banks acknowledges that the only thing he knew about Evans was what he observed and what Paulin reported to him. (Banks Dep., PageID 252, (95:21–24).  As for Feehan, he did not even talk with Paulin. (Feehan Dep., PageID 622, (55:7–56:3)).

3

> Q: What communication did you have with Trooper Paulin on the evening in question?
>
> A: I don't believe I had any.
>
> Q: So are you telling me that you had no communications with Trooper Paulin until after Emily was injured?
>
> A: Correct.
>
> Q: Did Trooper Paulin ever report that Emily was uncooperative?
>
> A: Did he ever tell me directly?
>
> Q: Yes.
>
> A: No.

(Feehan Dep., PAGEID622, (55:7–56:3)).

From the moment Evans arrived at the Jail, Evans's and Defendants' actions were captured on video. Doc. 29, 76. Evans was escorted in handcuffs from Trooper Paulin's patrol car to inner receiving by Defendants Feehan, Banks, and Yetter. (Banks Dep., PageID 247–248, (75:12–76:5)). Video footage shows Evans walking cooperatively, without resisting, as Defendants held her by her upper arms. (Feehan Dep., PageID 623, 57:10–19; Video Footage, Handheld View, doc. 76 (00:00–00:18)). Banks began escorting Evans, holding her by her handcuffs and applying pressure to her upper right arm and continuing to pull on Evans's handcuffs, pinching her wrists and pushed Evans's elbow forward in hyperextension. (See Video Footage, Handheld View, doc. 76 (00:21–36)).

The scene unfolds as one progressively escalated. Evans is heard continually asking Banks to stop and informing him that her arms and wrists were in pain. When Banks continued, and Evans again asked him to stop, and Yetter responded "[s]top pulling away or this is going to get a lot worse, I'll tell you that." (Banks Dep., PageID248, (78:1–3); Video Footage, Handheld

View, doc. 76 (00:24)). After Evans asked "[a]re you serious?" Feehan interjects, "Do what they tell you to do. Yeah, we're serious. Do what they tell you, or I'll tase you. Have you ever been tased before? It hurts." (Feehan Dep., PageID 628, (80:15–21); Video Footage, Handheld View, doc. 76 (00:38–00:42)). Defendants continued to pull on Evans's handcuffs and push her elbow forward, in spite of the fact that Evans complained that the handcuffs were too tight and in spite of the fact that Evans was stationary and cooperative. (Banks Dep., PageID 238, (37:3–15)). Although Defendants had the authority to do so, they failed to place Evans either in a restraint chair or in a cell, specifically for "sobering up." (Yetter Dep., PageID 848; 850, (65:9–19; 75:13–18)).

Indeed, the Jail's Manual Use of Force Policy says, "When a staff member realizes that his communication with the prisoner is escalating into a confrontation, he should attempt to diffuse the situation by using interpersonal communication and body language" and "the use of force must be a last resort in controlling inmates." (Feehan Dep., PageID 619, (41:2–13)). Defendants could have decided to place Evans in a restraint chair. (Yetter Dep., PageID 848, (65:9–19)). Defendants could have even put Evans in a cell "in the waiting area specifically for [the] purpose" of placing highly intoxicated people to "sober up" before booking. (Id., PageID 850, (75:13–18)).

Evans placed her head on the blue mat as she was told; but Banks continued, "I'm going to hold onto you until this is over but you're not going to let go, I'm much stronger than you and you're not going to let go." (Banks Dep., PAGEID249, (84:8–11); Video Footage, Handheld View, doc. 76 (01:44–01:54)). Evans continued to express her pain vulgarly. (Id.). Given Evans' profane protestations, a reasonable juror could conclude that Defendants continued to inflict unreasonable pain on her. Then Feehan pointed the flashlight of his Taser directly at

5

Evans's head and eyes, ordering her to face forward.[3] (Banks Dep., 71:24–25; Video Footage, Handheld View, doc. 76 (02:02–02:06)). Evans continued to plead and stated, *inter alia*, "Honestly...this hurts. I'm not resisting anything, officer."[4] (Video Footage, Handheld View, doc. 76 (02:07–02:12)).

As Defendants' search proceeded, Defendants instructed Evans to kneel on a bench, to the left of the blue mat. (Banks Dep., 130:3–5; See Plaintiff's Video Footage, Camera 3). While Evans did this, a reasonable juror could conclude Banks continued to apply pressure to her wrists and arm, causing her to writhe in pain. (See Plaintiff's Video Footage). While in the course of removing Evans' boots and socks, Yetter pulled Evans' left knee off the bench, causing her to lose her balance. A reasonable juror could conclude that Evans subsequently attempts to regain her balance. (Banks Dep., PageID 263, (137:19138:8); Video Footage, Camera 3 (4:56:16)).

The same reasonable juror could next conclude that video footage shows Banks forcefully picked up Evans from the bench by her wrists and right arm. (Id. (4:56:19–21). He then pivots to his right, raises her in the air, looks to spot where he is throwing her and slams her head–first onto the concrete floor, knocking her unconscious. (Id. (4:56:22–24)). Banks then emphatically exclaims, "Oo! Now lay there!" while looming over an unconscious Evans. (Id.). He asks the unconscious, immobile Evans, "Are you done resisting?! Are you done?!" The officers are then heard reconstructing a version of events, with one asking, "Did you see her stand up?" Someone answers, "Yeah." This is quickly embellished to, "She all but—she jumped!" But as Evans comes to consciousness, they instruct her, "You fell."

---

[3] Feehan was disciplined for his use of the taser by the Montgomery County Sheriff's Office.
[4] The ellipses in the quotes of Evans generally omit profanities.

Banks later prepared a Use of Force Report regarding Evans, which contained a statement from Banks that he "guided her mid-section to the floor" in the course of a "control hold and balance displacement of Evans." (Plaintiff's Exhibit 1, PageID 2195).

Dr. Michael Lyman, Plaintiff's expert witness, concludes that Evans is "immediately ... pulled back by Officer Banks and directed forcefully–to the floor." (Lyman Dep., Doc. 56, PageID 1345, (155)). The video shows "Evans pivoting and trying to keep her balance and at one point she does appear to lean to the right and attempt to stand. However, at this point she is still facing the wall but is not projecting herself back toward Banks as defendant officers state. Instead, as soon as Evans began to stand up, Banks, who still had a firm grasp on her, pulls her back and forcefully slams her to the concrete floor while she was still handcuffed in the back."

**II.     Standard**

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

**III.    Excessive Force**

A person has a right under the Fourth Amendment to be free from the use of excessive force during an arrest. U.S. Const. amend. IV.  For the violation of constitutional rights, a party may bring a cause of action under 42 U.S.C. § 1983, which states in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage of any state ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws" shall be liable at law or in equity to the injured party.  Section 1983 does not confer any substantive rights, but rather serves as a vehicle through which the violation of constitutional rights may be vindicated. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

"[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, ––– U.S. ––––, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015).  "Objective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Factors to consider include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). *See also Morabito v. Holmes*, 628 F. App'x 353, 357 (6th Cir. 2015).

The Sixth Circuit considers the following reasonableness factors to assess a detainee's excessive force claim: the severity of his crime, whether he posed an immediate threat to the safety of others, and whether he was actively resisting arrest or attempting to evade arrest. *Burgess v.*

8

*Fischer*, 735 F.3d 462, 474 (6th Cir. 2013) (*citing Martin*, 712 F.3d at 958). The Fourth Amendment's reasonableness standard extends "at least through the completion of the booking procedure . . . ." *Id*, 735 F.3d at 472–73.  Under the Fourth Amendment's objective reasonableness analysis courts consider the totality of the circumstances, as well as three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).   A reasonable juror could find all of these factors weighing against Defendants Banks and Feehan.

      **a.**    **Yetter and Ort**

The factual record before the Court shows that, at the very most, Yetter and Ort used *de minimis* force in this case.   Yetter did have her hands on Evans in searching her and attempting to remove her boots and socks, and Ort had his hands on Evans only to assist in removing a piece of jewelry and while Evans was initially on the bench.   Accordingly, Yetter and Ort did not violate any constitutional right and will be awarded summary judgment.

      **b.**    **Feehan**

As to Feehan, the only claim of excessive force against him is the pointing of the taser at Evans's face.  Courts have suggested that pointing a taser must serve a purpose beyond simply inflicting gratuitous fear. *McDaniel v. Yearwood*, 2012 U.S. Dist. LEXIS 19667, 2012 WL 526078, *27 (D. Ga. Feb. 16, 2012) (the threatened use of a taser could constitute excessive force but only when the threat was made for the "malicious purpose of inflicting gratuitous fear"); and *Parker v. Asher*, 701 F. Supp. 192 (D. Nev. 1988) ("guards cannot aim their taser guns at inmates for the malicious purpose of inflicting gratuitous fear.").  A jury could reasonably conclude that

Feehan intended to maliciously inflict gratuitous fear when he aimed his taser directly at Evans's head.

  c. **Banks**

Defendants argue that Evans cannot distinguish *Standifer v. Lacon*, 587 F. App'x 919 (6th Cir. 2014), a case in which "video shows that Lacon did not slam, shove, or throw Standifer to the ground; at most he guided her down by pulling her arms up and pushing the rest of her body down…." The Court can readily distinguish *Standifer*. Here, video shows Banks did more than "guide [Evans] down." A reasonable juror could conclude that he "slam[med], shove[d], or thr[e]w [her] to the ground." The instant case is disturbingly similar to *Burgess*, a case from a neighboring county, nine months before Evans's arrest:

> Defendants assert that Burgess was irate and attempting to leave the mat area where the search was being conducted, and that he failed to comply with orders to stand still. Burgess was warned that his continued noncompliance would result in a takedown. Burgess did not heed the warning, and McKinney ordered the takedown after Burgess' "blow job" remark and continued physical resistance.

*Burgess v. Fischer*, 735 F.3d 462, 470 (6th Cir. July 30, 2013). Fractures to Burgess' jaw and skull required surgery. *Id.*, at 470. The Sixth Circuit vacated an award of summary judgment in *Burgess*, summary judgment must be denied here.

**IV. Qualified Immunity**

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). A qualified immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that

right was clearly established. *Pearson*, 555 U.S. at 232. These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages. *Pearson*, 555 U.S. at 236; *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

Defendants claim that qualified immunity should be afforded Banks and Feehan because the standard of care applied in their case was not clearly established at the time of the events under review. PageID 2261. To this end, Defendants cite *Miranda–Rivera v. Toledo–Dávila*, 813 F.3d 64, 70 (1st Cir. 2016)(identifying a split that existed among the circuits back in 2007). Since 2007—indeed, nine months prior to the events under review—the Sixth Circuit found qualified immunity not to apply in the remarkably similar case of *Burgess v. Fischer*, 735 F.3d 462, 470 (6th Cir. July 30, 2013). If qualified immunity did not apply in *Burgess v. Fischer*, it surely cannot apply here. Summary judgment for Banks and Feehan is denied.

**V.** *Monell* **Liability**

Before a municipality can be held liable under Section 1983, a plaintiff must show injuries that were caused by some "policy or custom" attributable to the municipality. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989)(quoting *Monell*, 436 U.S. at 690). Under *Monell*, a municipality is liable only where its policies are the "moving force" behind the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (quoting *Monell*, 436 U.S. at 694). The Plaintiff cannot base any claims against the Montgomery County Sheriff's Office—through Sheriff Plummer—solely on the individual Defendants' conduct, because *respondeat superior* is not available as a theory of recovery under section 1983. *Monell*, 436 U.S. at 691.

Four types of Monell claims have been recognized in the Sixth Circuit: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F.3d at 478.

In this case, only (3) is alleged in the Complaint. To establish this claim, Evans must first identify a training deficiency, and then must "prove that the deficiency in training actually caused the police officers' indifference to the rights or needs of the person harmed." *Estate of Sowards v. City of Trenton*, 125 Fed. App'x 31, 42 (6th Cir. 2005). The Sixth Circuit law on this claim was recently summarized by the Eastern District of Michigan:

> To succeed on a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendants' deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

*Lucier v. City of Ecorse*, 2014 U.S. Dist. LEXIS 42271 (E.D. Mich. 2014).

This standard is not satisfied in this case. There is no pattern of unconstitutional practices in this record, nor is there any evidence of failure to train, or training that is reckless or grossly negligent. Evans has not produced evidence that would support a *Monell* claim.

Evans alleges a ratification claim. Dr. Michael Lyman, Plaintiff's expert witness, testified his opinion is that Banks' actions were ratified by the Montgomery County Sheriff's Office when he was not disciplined. A plaintiff may establish *Monell* liability by showing that the municipality ratified its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989). There was an internal investigation of the incident by the Montgomery County Sheriff's Office, doc. 60-1, PageID 2014–30, and discipline was handed out to Feehan for pointing the taser. As such, a ratification claim based on Evans's conduct would fail as a matter of law. *See Burgess v. Fischer*, 735 F.3d at 479.

The internal investigation of Banks concluded "Bank's action[s] were consistent with Sheriff's Office Policy and declared **proper conduct.**" Doc. 60-1, PageID 2000 (emphasis in original). A *Monell* claim based upon ratification of unconstitutional behavior is an "inaction theory" requiring a plaintiff to show not only that the investigation was inadequate, but that the flaws in the investigation were representative of: (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the constitutional deprivation here. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1989); France v. Lucas, No. 1:07CV3519, 2012 WL 5207555, at *13 (N.D. Ohio Oct. 22, 2012).

If Evans had evidence of a clear and persistent pattern of activity similar what a reasonable juror could conclude occurred with Evans, it would be something about which the Department

13

should have known and the conclusion of the report might support a finding of deliberate indifference. But, there is no evidence presented to the Court of a pattern or practice similar to either Banks's or Feehan. Thus, Evans's ratification claims fails with regard to Banks as well.

The Court recognizes that a plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); see also *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir.2005). Plaintiff cannot establish *Monell* liability on a single–act theory by asserting that Sheriff Plummer's approval of the post hoc investigation was sufficient for a finding that there was a unconstitutional policy. On a single–act theory, a plaintiff must demonstrate that a "deliberate choice to follow a course of action is made from among various alternatives by the official ... responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292. Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm. See id. at 484–85, 106 S.Ct. 1292 (finding *Monell* liability where the final decision maker ordered deputies to enter the plaintiff's medical clinic in violation of his Fourth Amendment right); *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n. 20 (6th Cir.2009) (affirming denial of summary judgment on *Monell* claim where Plaintiff alleged that final policymaker directed the destruction of material evidence); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir.1994).

In the instant case, Plummer did not order the takedown, nor does Plaintiff assert that a course of action selected by Plummer was the moving force behind Evans's injury. Plummer's after–the–fact approval of the investigation, which did not itself cause or continue a harm against Evans, was insufficient to establish the *Monell* claim. Cf. *Pembaur*, 475 U.S. at 481–84, 106 S.Ct.

14

1292; *Moldowan*, 578 F.3d at 394 & n. 20. In sum, even assuming there was an underlying constitutional violation, the *Monell* claim should be dismissed because Plaintiff has failed to set forth sufficient facts to establish an unconstitutional custom or policy. See *Burgess v. Fischer*, 735 F.3d at 479.

**VI.     Assault and Battery**

Employees of an Ohio political subdivision who act within their official duties are statutorily immune from suits in tort based on mere negligence. *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 983 N.E.2d 266, 271–72 (2012). To overcome this immunity, the alleged action or inaction must be committed "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). "'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 658 N.E.2d 814, 821 (1995). A defendant can be said to act in "bad faith" where it is shown that he acted with a "dishonest purpose," or "conscious wrongdoing," or he breached a "known duty through some ulterior motive or ill will." Id. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson*, 983 N.E.2d at 273 (emphasis added). And finally, "reckless conduct" is the "conscious disregard of or indifference to a known or obvious risk of harm ... that is unreasonable under the circumstances and is substantially greater than negligent conduct." Id.

Plaintiff asserts that the takedown by Banks amounted to battery and that Feehan's pointing of the taser at her head constituted assault. Viewing the facts in a light most favorable to Plaintiff, there is a question as to whether the conduct was reckless under § 2744.03(A)(6)(b). See *Burgess v. Fischer*, 735 F.3d 462, 479–80 (6th Cir. 2013)(citing *Harris v. City of Circleville*, 583

F.3d 356, 370 (6th Cir.2009) (applying Ohio law)). On Plaintiff's alleged facts, the handcuffed, intoxicated, and physically compliant Evans was slammed to the ground by Banks, resulting in serious injury. Surely there is a question as to whether this conduct amounted to recklessness. Similarly the pointing of a taser at her head, when one considers the possibility of it being activated, intentionally or not, is an assault. Here, a jury could determine that the Banks and Feehan's actions were reckless and that they were aware that their conduct created an unreasonable risk of physical harm to the plaintiff.

**VII. Conclusion**

Because all force exercised by Yetter and Ort was reasonable, Defendants' Motion for Summary Judgment, doc. 60, is **GRANTED** with regard to them. Because reasonable jurors could conclude that Feehan and Banks used excessive force in a manner that violated clearly established constitutional rights in a manner of which a reasonable person would have known and because a reasonable juror could conclude that their actions were reckless, Defendants' Motion for Summary Judgment, doc. 60, is **DENIED** with regard to them on Plaintiff's excessive force, assault and battery claims. Because there is no evidence that Evans's injuries were caused by a policy or custom, Defendants' Motion for Summary Judgment, doc. 60, is **GRANTED** with regard to Sheriff Plummer.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, July 14, 2016.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE